IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| NADIS BARUCIC,<br><br>Plaintiff,<br><br>v.<br><br>TITAN TIRE CORPORATION,<br><br>Defendant. | Civil Case Number:<br>4:10-cv-00287-JAJ-CFB<br><br><br>**ORDER** |

This matter comes before the Court pursuant to Defendant's December 27, 2011 Motion for Summary Judgment. [Dkt. No. 16.] On January 30, 2012 Plaintiff filed a Response to the Motion for Summary Judgment [Dkt. No. 24.] and Defendant replied on February 8, 2012. [Dkt. No. 30.] The Motion for Summary Judgment is **GRANTED**.

## I. FACTUAL BACKGROUND

Titan Tire ("Defendant") is a foreign corporation registered and conducting business in Iowa. Defendant maintains a facility in Polk County, IA. In 1998, Silverhawk Security hired Nadis Barucic[1] ("Plaintiff") to work as a security guard at the Defendant's facility in Polk County. In 1999, the Defendant hired the Plaintiff to work as a Human Resources Assistant at the Polk County facility and he reported directly to Joyce Kain, the Human Resources Manager. In addition to being given various HR responsibilities, the Plaintiff was asked to help with the recruitment of employees for the

---

[1]The plaintiff is of Bosnian national origin.

1

facility.[2] After only a few months, the Plaintiff was responsible for recruiting much of the Defendant's work-force, including several hundred Bosnian workers.[3] At some point the Plaintiff was promoted to the position of Human Resources Supervisor and given greater responsibility. During his employment, Plaintiff's salary increased from $27,040 to $46,000.

The events giving rise to this lawsuit took place some ten years after the Plaintiff was hired by the Defendant.[4] Throughout the course of the Plaintiff's employment, he was charged with collecting information and completing the paperwork for the United States immigration I-9 forms. He prepared the I-9 forms which were then signed by Ms. Kain, except in circumstances where she was absent for prolonged periods of time.[5] The Plaintiff organized the I-9 information by maintaining an Excel spreadsheet with the pertinent information. One item on the spreadsheet pertained to the expiration of employees' permanent resident cards or other work authorizations. Eventually, the Plaintiff was given the responsibility of sending notices to employees with expiring I-9 documents. These records were then maintained in his supervisor's office.

In 2008, Kathy Dietrich, an auditor for the Defendant, traveled to the Polk County

---

[2]His job duties further entailed inputting data into the computers, tracking attendance, translating for Bosnian recruits and employees, filing, and other tasks and responsibilities as assigned by Ms. Kain, the Human Resources Manager.

[3]Both parties admit that the Defendant employs a large number of Bosnian employees—approximately a quarter of its workforce.

[4]Two incidents during the interim ten years are of importance. First, the Plaintiff alleges that sometime in 2000, Ms. Holley told him not to accept doctor certification's for FMLA leave from any doctor in Bosnia. Second, the Plaintiff alleges that Ms. Holley made statements in 2006 or 2007 regarding firing employees who did not speak English and moving to an English-only policy.

[5]During her deposition, Ms. Kain was asked about I-9 authorization. "Q: Who was authorized to sign off on the completeness or compliance with the I-9 documentation system? A: I believe either [myself or the Plaintiff] could have signed off on it, but [the Plaintiff] preferred that I did, so I did it." [Plaintiff's App. at 58.]

facility to conduct an audit. Upon review of the Plaintiff's spreadsheet, Ms. Dietrich approached the Plaintiff and asked if he was re-verifying employees' permanent resident cards. Ms. Dietrich approached Ms. Kain about the issue and the Plaintiff was present during an argument wherein Ms. Dietrich told them that they should not be re-verifying these documents. After Ms. Dietrich left, Ms. Kain and the Plaintiff had a phone conversation with INS[6] and the Plaintiff claims that Ms. Kain confirmed that the re-verification process was proper as long as they were re-verifying all employees in the same manner. In response, the Plaintiff continued re-verifying the documents. Ms. Dietrich claims that she specifically told the Plaintiff not to re-verify these documents during the 2008 meeting, and again in 2009.[7]

In late March or early April of 2009, the Plaintiff was called into a meeting with Ms. Kain and Becky Knutson, counsel for the Defendant in a lawsuit brought by employee Izet Duric. The Plaintiff alleges that during this conversation he was told by Ms. Kain and Ms. Knutson that his testimony was needed to bolster the fact that the Defendant did not discriminate against Bosnians. The Plaintiff further alleges that he told both Ms. Kain and Ms. Knutson that he refused to testify to that effect and that he felt the Defendant discriminated against Bosnians by giving them more difficult assignments in the mill room. The Plaintiff was not called to testify at the Duric trial.

Sometime in 2009, the Plaintiff informed Ms. Kain that Mr. Rodriguez-Villegas, an employee of the Defendant, would need to re-verify his I-9 documents. Mr. Rodriguez-Villegas provided the Plaintiff and Ms. Kain with a form I-551 and his

---

[6]The parties refer to the "INS" which became the U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP") in 2003.

[7]Further, Ms. Dietrich claims that Ms. Kain directed all I-9 questions to the Plaintiff as they were now part of his responsibilities. The 2009 audit was conducted while Ms. Kain was on vacation. The Plaintiff was instructed by Ms. Kain to work with Ms. Dietrich during the 2009 audit.

3

Mexican Passport. An attempt to verify the documents with INS revealed that the I-551 was not valid. As a result, Mr. Rodriguez-Villegas was terminated from his position on April 16, 2009.

In July of 2009, Cherri Holley, General Counsel for the Defendant, was notified that Mr. Rodriguez-Villegas had retained counsel, Mark Sherinian. Mr. Sherinian claimed that Mr. Rodriguez-Villegas' termination violated the law because the Defendant could not require green card holders to re-verify certain documents related to their I-9s. Ms. Holley consulted with Assistant General Counsel, Patrick Shine, and confirmed Mr. Sherinian's claims. Mr. Rodriguez-Villegas was reinstated with $12,000 in back pay. Ms. Holley investigated the matter and was informed by Ms. Dietrich that all I-9 questions were directed to the Plaintiff and she had twice informed him that he should discontinue re-verifying the permanent residency cards. On August 11, 2009, Ms. Holley traveled to the Polk County facility and interviewed the Plaintiff and Ms. Kain.

After the interview, Ms. Holley determined that Ms. Dietrich was telling the truth and that Ms. Dietrich had informed the Plaintiff not to re-verify the permanent residency cards. Further, Ms. Holley found the Plaintiff's story to be unpersuasive and untruthful. Ms. Holley believed that the Plaintiff's violations resulted in the termination of Mr. Rodriguez-Villegas and, thus, the resulting lawsuit. On August 13, 2009, the Plaintiff's employment was terminated.

## II. CONCLUSIONS OF LAW

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides the standard for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the

court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. HDC Med., Inc., v. Minntech Corp., 474 F.3d 543, 546 (8th Cir. 2007) (citation omitted). "[S]ummary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Med. Liab. Mut. Ins. Co. v. Alan Curtis LLC, 519 F.3d 466, 471 (8th Cir. 2008); see also Kountze ex rel. Hitchcock Found. v. Gaines, 536 F.3d 813, 817 (8th Cir. 2008) ("[S]ummary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.").

Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "[A]n issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. et al., 536 F.3d 939, 944 (8th Cir. 2008) (citation omitted). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" Saffels v. Rice, 40 F.3d 1546, 1550 (8th Cir. 1994) (citation omitted). The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). "[A]lthough [the non-moving party] does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that she [or he] relies 'upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion.'" Taylor v. White, 321 F.3d 710, 715 (8th Cir. 2003) (citation omitted). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Sprenger, 253 F.3d at 1110.

5

Summary judgment in employment discrimination cases should be treated with particular care because "such actions are inherently fact based." Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir. 2005) (citations omitted). That said, the Eighth Circuit Court of Appeals recently reiterated,

> Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

This Court has subject matter jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's Iowa Civil Rights Act ("ICRA") claims pursuant to 28 U.S.C. § 1367.

## B. Employment Discrimination Claims Under Title VII and ICRA

Plaintiff brings claims alleging that the termination of his employment constituted national origin discrimination under both Title VII and the ICRA.[8] Title VII makes it an unlawful employment practice for an employer to "discharge . . . any individual . . . because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has stated that "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her

---

[8]ICRA prohibits employment discrimination based on national origin in much the same manner as Title VII. See Iowa Code § 216.6(1)(a) (2011) ("It shall be an unfair or discriminatory practice for any: person to . . . discharge any employee . . . because of . . . national origin . . ."). As indicated by the Eighth Circuit Court of Appeals, Iowa Courts have analyzed ICRA claims by applying the federal framework. Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1046 (8th Cir. 2003) (citing Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n, 322 N.W.2d 293, 296 (Iowa 1982)). As such, this Court will utilize the same analysis for Plaintiff's Title VII and ICRA claims. In the instance the federal framework and the Iowa framework differentiate, this Court will address the issues separately. See Newberry v. Burlington Basket Co., 622 F.3d 979 (8th Cir. 2010) (finding difference between the ADEA and ICRA).

6

ancestors came." Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 87, 94 S. Ct. 334, 336 38 L. Ed. 287 (1973). EEOC regulations indicate that "national origin" includes not only a person's place of origin, but also includes all those having the "physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. The Supreme Court made clear that Congress did not intend for the concept of "national origin" to include citizenship or alienage. Espinoza, 414 U.S. at 92, 95. Plaintiff's national origin is Bosnian.

Both parties agree there is no direct evidence of national origin discrimination in this case. As such, Plaintiff's claim will be analyzed under the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). Under the McDonnell Douglas framework, Plaintiff must first establish a *prima facie* case by showing "(1) he is a member of a protected group; (2) he was performing his job at a level that met the employer's legitimate expectations; (3) he was discharged; and (4) there are 'facts adequate to permit an inference of discrimination.'" Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir. 1994). Once a *prima facie* case is established, the burden shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for firing the Plaintiff. Amini v. City Of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Torgerson, 643 F.3d at 1046–47). Once the Defendant provides such a reason, the burden then shifts back to the Plaintiff to show that the legitimate reasons offered by the Plaintiff were a mere pretext for discrimination. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 530 U.S. at 143. This burden to show pretext "merges with the ultimate burden of persuading the court that [they were] the victim of intentional discrimination." Torgerson, 643 F.3d at 1046 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S.

7

248, 259, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

In this case, the Defendant does not dispute Plaintiff's ability to present a *prima facie* case. Rather, the Defendant provides evidence as to a legitimate nondiscriminatory reason for firing Plaintiff and argues that the Plaintiff is unable to rebut this reasoning with evidence of pretext. Plaintiff argues that, while no direct evidence of discrimination exists, Defendant did not have a legitimate reason to terminate the Plaintiff's employment and, further, that there is circumstantial evidence creating a genuine issue of material fact as to whether Defendant's stated reason is merely a pretext for unlawful discrimination.

### 1. *Non-Discriminatory Reason for Defendant's Termination*

"The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Torgerson, 643 F.3d at 1047 (quoting Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir.1999)). Poor job performance, illegal acts, and violating company directives are all legitimate nondiscriminatory reasons for the termination of an employee. Further, because Plaintiff was an at-will employee, Defendant need not have cause to fire the employee. Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 280–81 (Iowa 2000) (citing Harrod v. Wineman, 125 N.W. 812, 813 (Iowa 1910)).

The record is consistent with respect to Defendant's reason for terminating the Plaintiff's employment. Ms. Holley terminated the Plaintiff's employment on belief and understanding that (1) the Plaintiff handled the I-9s in the HR office[9], (2) the Plaintiff had been instructed by Ms. Dietrich not to re-verify permanent resident cards, (3) the Plaintiff

---

[9]Ms. Holley believed that the job of maintaining and handling the I-9s was assigned to the Plaintiff and both Ms. Dietrich and Ms. Kain confirmed that the Plaintiff handled the I-9s. Further, Plaintiff's job description required him to complete all tasks assigned to him by the Human Resources Manager, Ms. Kain, who confirmed that she directed all I-9 questions to the Plaintiff.

over-rode this directive and requested a re-verification from Rodriguez-Villegas, (4) Rodriguez-Villegas was fired as a result of the process, and (5) the resulting lawsuit exposed the Defendant to financial liability. This record contains sufficient evidence as to Defendant's nondiscriminatory justification for terminating the Plaintiff's employment.

Further, "we are concerned not with whether [the employer] was correct in its determination that [the employee's] job performance was unsatisfactory, but only with whether this was the real reason for the termination and not a pretext for age discrimination." Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 292 (8th Cir. 1982) (citing Douglas v. Anderson, 656 F.2d 528, 533 n.5 (9th Cir. 1981)). "The key question in a discrimination case like this one is not whether [the employee] was truly fighting, but whether the employer really believed that he was fighting, such that the termination was based on a non-discriminatory reason." Hitt v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004) (citing Scroggins v. Univ. of Minnesota, 221 F.3d 1042, 1045 (8th Cir. 2000)). As such, Plaintiff's assertions regarding Ms. Holley making an incorrect decision or Ms. Kain and Plaintiff's belief that they were doing nothing wrong, are irrelevant to the overall determination of the nondiscriminatory reason proffered by the Defendant. What is important is Ms. Holley's truly held belief at the time of termination. The record is clear that the decision to fire the Plaintiff was based on Ms. Holley's understanding that the Plaintiff was the cause of the Rodriguez-Villegas lawsuit, rehiring, and exposure to financial liability. "Courts are not permitted to second-guess an employer's personnel decision or to correct an unwise decision if the employer gives an honest, nondiscriminatory explanation for its decision." Worley v. Alltel Corporate Servs., Inc., 2008 WL 90026 at *3 (E.D. Ark. Jan. 7, 2008) (citing Gill v. Reorganized Sch. Dist R-6, 32 F.3d 376, 379 (8th Cir.1994)). "We are not concerned with the correctness or wisdom of the reason given for the [the decision maker's decision], but only 'whether [the reported incident] was the real reason for [the Plaintiff's] termination and not a pretext for [national origin] discrimination.'" Gill, 32 F.3d at 379 (citing Crimm v. Missouri Pac. R.

9

Co., 750 F.2d 703, 711 (8th Cir. 1984)).

Accordingly, the Defendant has satisfied its burden to put forth a nondiscriminatory reason for the termination of Plaintiff's employment.

## 2. *Pretext for Discrimination*

Once the Defendant has met its burden in establishing a legitimate nondiscriminatory reason for the termination of Plaintiff's employment, the burden shifts to the Plaintiff to create a genuine issue of material fact that the Defendant's reason was a mere pretext for discrimination. Amini, 643 F.3d at 1074 (citing Torgerson, 643 F.3d at 1046–47).

The Plaintiff relies on a number of arguments to show the termination of employment based on the Rodriguez-Villegas incident was a pretext for national origin discrimination. The Plaintiff argues that Ms Holley's treatment of Ms. Kain, as compared to the Plaintiff, is sufficient to establish pretext. Further, the Plaintiff argues that Ms. Holley's good faith belief, standing alone and in light of other evidence, cannot be sufficient as a basis for the termination of his employment and is therefore pretextual.

The Plaintiff alleges that Ms. Holley's decision to terminate the Plaintiff and not punish Ms. Kain, a non-Bosnian, creates a genuine issue of material fact as to whether similarly situated employees were treated differently. The Plaintiff is able to raise a genuine issue of material fact as to pretext only if the Plaintiff can show similarly-situated employees, who are not Bosnian, were treated differently. Wheeler v. Aventis Pharm., 360 F.3d 853, 857 (8th Cir. 2004). "The test to determine if one is 'similarly situated' varies at each stage of a McDonnell Douglas analysis. At the prima-facie stage it is 'not onerous,' however at the third stage (proving pretext) it is 'rigorous.'" Id. (quoting Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir. 1994)). "For discriminatory discipline claims, employees are similarly situated only when they are involved in or accused of the same offense and are disciplined in different ways." Id. (citing Harvey v.

10

Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994)). "Employees are not similarly situated if they have engaged in differing degrees of misconduct." Kight v. Auto Zone, Inc., 494 F.3d 727, 735 (8th Cir. 2007). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). The burden for proving that the employees were similarly situated is on the Plaintiff and "[i]t is not up to the employer to prove dissimilarity." Smith v. Eaton Corp., 195 F. Supp. 2d 1079, 1094 (N.D. Iowa 2002) (citing Lanear v. Safeway Grocery, 843 F.2d 298, 300 (8th Cir. 1988)).

In this case, Ms. Holley made the ultimate decision as to the disciplinary actions. First, Ms. Holley was under the belief that the Plaintiff was twice warned for his conduct. Further, the record indicates that Ms. Dietrich informed Ms. Holley that she dealt directly with the Plaintiff, and not Ms. Kain, with respect to the I-9 forms and the re-verification process.[10] Further, Ms. Dietrich accused the Plaintiff of misconduct, not Ms. Kain. The Plaintiff testified that he had no evidence to show that Ms. Holley did not believe Ms. Dietrich's accusations.[11] Simply put, Ms. Holley was given evidence regarding the Plaintiff's actions and, ultimately, made her decision based on this evidence. Although the Plaintiff may have felt his termination was a sanction disproportionate to his conduct, the discipline was a matter within Ms. Holley's discretion. As long as the decision was not motivated by unlawful considerations, it is beyond the power of this Court to review it. Additionally, Ms. Holley had previously terminated Geri Broge, a similarly situated non-Bosnian employee, for infractions related to mis-management of the I-9s. The

---

[10]As the Court of Appeals for the D.C. Circuit noted, "[a]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005).

[11]"Q: Do you have any evidence that Ms. Holley did not believe Ms. Dietrich? A: I don't have any evidence." [Defendant's App. at 15.]

11

Defendant articulated a legitimate business purpose for the Plaintiff's termination and the Plaintiff has failed to demonstrate pretext.[12]

The Defendant claims Ms. Holley made statements in 2006 or 2007 regarding firing employees who did not speak English and moving the company towards an English-only policy. Such language classifications and English-only policies are not inherently evidence of national origin discrimination. "Language and national origin are not interchangable." Napreljac v. John Q. Hammons Hotels. Inc., 461 F. Supp. 2d 981, 1029 (S.D. Iowa 2006) (citing Hannoon, 324 F.3d at 1048.) ("Interchanging national origin and language is a legal and logical error."). Classifications made based on English-speaking versus non-English-speaking are classification made on language and "[l]anguage, by itself, does not identify members of a suspect class." Id. (quoting Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir. 1983)). Further, the Defendant admits such a policy was never implemented. Even if such a remark were tied to some discriminatory animus, "stray remarks, standing alone, may not give rise to an inference of discrimination . . ." Girten v. McRentals, Inc., 337 F.3d 979, 983 (8th Cir. 2003) (quoting Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 922 (8th Cir.2000)). The Court finds that such a policy based remark does not suggest an underlying pretextual animus for discrimination based on national origin.[13]

The Defendant has articulated a legitimate nondiscriminatory reason for Plaintiff's

---

[12] The Court also notes that the Plaintiff maintains he had a positive relationship with Ms. Holley during the course of his employment and that he never had any disputes or arguments with her. [Defendant's App. at 2.]

[13] The Plaintiff further relies on statements even more remote in time than Ms. Holley's 2006 comments. The Plaintiff alleges that in 2000, Ms. Holley told him not to accept doctor certification's for FMLA leave from any doctor in Bosnia. Even if Ms. Holley made this statement, the Defendant never initiated such a policy and the Defendant continued to hire and employ a large number of Bosnian employees. Further, such a comment is exactly such a "stray remark" that "standing alone, may not give rise to an inference of discrimination . . ." Girten, 337 F.3d at 983 (quoting Fisher, 225 F.3d at 922).

termination and Plaintiff has failed to raise a genuine issue of material fact as to pretext. Summary judgment as to Plaintiff's employment discrimination claims under Title VII and ICRA is therefore appropriate.

### C. Retaliation Claims Under Title VII and ICRA

In this case, there is no direct evidence of retaliation. As such, this Court applies burden-shifting framework established in McDonnell Douglas. 411 U.S. 792. Similar to the employment discrimination framework, the retaliation burden-shifting framework requires the Defendant to first present a *prima facie* case of retaliation. See Hughes v. Stottlemyre, 506 F.3d 675, 678–79 (8th Cir. 2007), cert. denied, 552 U.S. 1296, 128 S. Ct. 1741, 170 L. Ed. 2d 540 (2008). Establishing a *prima facie* case of retaliation to defeat summary judgment requires a showing that: "(1) [the plaintiff] engaged in statutorily protected activity; (2) an adverse employment action was taken against [the plaintiff]; and (3) a causal connection exists between the two events." Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006). The Defendant challenges the Plaintiff's *prima facie* case, arguing that the Plaintiff is unable to raise a genuine issue of material fact as to the third prong—a causal link between the protected conduct and the termination of the Plaintiff.[14]

The Plaintiff argues; (1) Ms. Knutson and Ms. Kain's treatment of the Plaintiff as a witness in the Duric trial and his insistence on testifying that he thought there was

---

[14]While neither side disputes that the Plaintiff engaged in protected activity, the record shows that neither Ms. Kain nor Ms. Knutson recall the Plaintiff protesting alleged discriminatory practices at the March meeting. "Q: And do you have any recollection of [the Plaintiff] ever telling you in Ms. Knutson's presence that he did believe the Bosnians were given less favorable job assignments? Ms. Kain: No, I don't recall that. . . ." [Plaintiff's App. at 61.] "Q: What do you recall [the Plaintiff] saying with respect to his reluctance to testify? Ms. Knutson: I don't recall his specific words. Just generally, that he didn't want to testify. He thought things would not go well for him in the Bosnian community if he testified against another Bosnian." [Plaintiff's App. at 72.]

13

discrimination taking place, establish a causal link between his protected activity and his firing, (2) the temporal proximity between his protected activity, the investigation, and the termination of his employment are evidence of a causal link, (3) Ms. Holley's exclusion of Ms. Kain from the firing process is evidence of a causal link, and (4) that the Defendant's attempt to conceal Ms. Holley's participation in the termination of Plaintiff's employment is evidence of a causal link.

As General Counsel, Ms. Holley was responsible for making key decisions in litigation and had the authority to settle cases. Plaintiff relies on this fact to allege that Ms. Holley must have known of both the Plaintiff's status as a witness and the Plaintiff's refusal to testify. In order for their to be a causal connection between the adverse employment decision and the protected activity, the decision maker must know about the protected activity. Clark Co. Sch. Dist. V. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). Ms. Holley—not Ms. Kain or Ms. Knutson—was the decision maker in this process and, as such, it is her knowledge and intent that is relevant.

The record contains no evidence indicating Ms. Holley was informed of the Plaintiff's protected activity. During Ms. Knutson's deposition she was specifically asked, "[d]id you have any conversations with Ms. Holley at all regarding potential witnesses in the Duric case?" Ms. Knutson answered, "[n]o." [Defendant's App. at 64.] Ms. Knutson was also asked if she relayed the information about the Plaintiff to Mr. La Seur, who may, in turn, have passed the information on to Ms. Holley. "Q. Do you recall specifically advising Mr. La Seur that Mr. Barucic was reluctant or hesitant to testify? A. I did not. Q. That never came up? A. It did not." [Defendant's App. at 64.] Ms. Holley confirmed this in her deposition:

> Q: So you don't, as you sit here today, recall being told or recieveing any information why Mr. Barucic, even though he was listed as a witness, didn't testify at trial?
> A: No.
> Q: And I went through the whole litany of potential people that you would have communications with. You don't recall receiving any communications

>     from anyone regarding either the listing of Mr. Barucic as a witness, or why
>     he didn't testify at trial?
>     A. No, huh-uh.

[Plaintiff's App. at 35.] Further, the Defendant agreed to provide all correspondence between Ms. Holley and Ms. Knutson pertaining to the Plaintiff's involvement in the Duric trial, and has indicated that no such documents exist. [Defendant's Supp. App. at 3] ("Defendant will produce any correspondence between Becky Knutson and Cheri Holley addressing Nadis Barucic in any way. There are no such documents."). The Duric trial documents that have been provided—which may have been reviewed by Ms. Holley—do not describe or omit the Plaintiff in a way that would put Ms. Holley on notice of any protected activity. Finally, Ms. Holley testified that she was in no way informed of the Plaintiff's involvement in the case, Plaintiff's concerns over the case, or any reasoning behind the Plaintiff not testifying. [Defendant's App. at 46.] Simply put, there is no evidence beyond mere speculation that Ms. Holley was ever informed of the Plaintiff's protected activity. Without more, an inference that Ms. Holley knew of the protected activity is contrary to the legal standard.

Plaintiff's argument regarding temporal proximity is, similarly, lacking. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (quotation omitted). The Eighth Circuit Court of Appeals has noted that "'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." Kipp v. Missouri Highway Transp. Com'n, 280 F.3d 893, 897 (8th Cir. 2002) (citations omitted) (noting that a two month gap in time was too remote as to create a causal connection). In this case, the Plaintiff's protected activity took place in late March or early April of 2009. The record indicates that the Plaintiff's employment

15

was not terminated until August of 2009, over four months later.[15] This evidence does not raise a genuine issue of material fact as to a causal link between the protected activity and the termination of Plaintiff's employment.

Plaintiff then attempts to rely on the fact that the termination of his employment was different from that of Ms. Broge and indicates that Ms. Broge's supervisor, and not Ms. Holley, signed Ms. Broge's termination notice. In both instances the supervisor and Ms. Holley had the power to terminate employment. Ms. Holley testified that in both instances she made the decision to terminate employment. [Defendant's App. at 56.] The Court is unpersuaded that the existence of Ms. Holley's signature on the Plaintiff's termination form and a supervisor's signature on Ms. Broge's termination form can raise a genuine issue of material fact as to whether Ms. Holley knew about the protected activity. The fact that Ms. Kain—with knowledge of the protected activity—was excluded from the termination process does not raise a legal or logical inference that Ms. Holley knew of the Plaintiff's engagement in protected activity.

Finally, the Court is unpersuaded that the Defendant attempted to hide Ms. Holley's involvement in the termination of Plaintiff's employment or that this would raise a genuine issue of material fact as to a causal link. First, Ms. Holley personally flew to interview and terminate the Plaintiff's employment. Second, the Plaintiff informed the Civil Rights Commission that Ms. Holley was the decision maker. Finally, Mr. Shine, Ms. Holley, and Ms. Kain all confirmed in their depositions that Ms. Holley made the decision.

---

[15]Plaintiff argues that an investigation began regarding the re-verification process starting in April of 2009. Ms. Dietrich noted that she recalled a conversation with Ms. Holley sometime in April regarding the re-verification process. During her deposition, Ms. Dietrich was uncertain as to the timing of her correspondence with Ms. Holley. [Defendant's App. at 42.] However, the record also shows that the e-mail Ms. Dietrich was referring to was dated July 16, 2009. [Defendant's Supp. App. at 43–44.] Regardless of when the review of the re-verification policy was initiated, this does not raise a genuine issue of material fact as to a causal link between the termination of employment and the protected activity.

The Court finds that the Plaintiff, in failing to raise a genuine issue of material fact as to the causal link between the termination of employment and the protected activity, has failed to establish a *prima facie* case for retaliation under Title VII and ICRA.[16] Summary judgment as to Plaintiff's Retaliation claims under Title VII and ICRA is therefore appropriate.

### D. Wrongful Termination in Violation of Iowa Public Policy

Count 5 of Plaintiff's Complaint alleges a "Wrongful Termination in Violation of Public Policy." Plaintiff alleges that he engaged in the protected activity of "insist[ing] upon providing truthful testimony against Titan" and that as a result, he was fired. In the Response to the Motion for Summary Judgment, Plaintiff argues that the Defendant has failed to respond to this claim and, therefore, the claim is appropriate for trial. In its Reply, Defendant argues that claims of "Wrongful Termination in Violation of Public Policy" are preempted by ICRA.

This claim is a repackaging of Plaintiff's claims for Retaliation under Title VII and ICRA.[17] ICRA and Iowa case law make it clear that a suit for discriminatory practices

---

[16] The Court reiterates that, even were a *prima facie* case for retaliation established by the Plaintiff, the Court has determined that the Defendant has raised a legitimate nondiscriminatory reason for the termination and that the Plaintiff has failed to raise a genuine issue of material fact as to pretext.

[17] The Plaintiff attempts to separate this cause of action from his Title VII and ICRA claims by framing it as a retaliation for his desire to testify truthfully in the Duric trial—as distinguished from opposing discrimination against Bosnian employees. These arguments are inseparable intertwined. This Court has noted the test for pre-emption as "'[i]f, under the facts of the case, success on the non-ICRA claims requires proof of discrimination' because the two claims rely on common operative facts, the non-ICRA claims cannot proceed." Napreljac, 461 F. Supp. 2d at 1038 (quoting Channon v. UPS, Inc., 629 N.W.2d 835, 858 (Iowa 2001)). In arguing Retaliation under Title VII and ICRA, Plaintiff's Response reads, "Genuine Issues of Material Fact Exist as to Whether Titan Fired Barucic in Retaliation for his Opposition to Discrimination ***and His Refusal to Provide False Testimony on Titan's Behalf***." [Plaintiff's Response at 29] (emphasis added). If the Plaintiff's desire to testify truthfully is the basis for his Title VII and ICRA claims of retaliation, any similar claim based on a violation of public policy

must be brought under the Civil Rights Act. "[T]he procedure under the civil rights act is exclusive, and a claimant asserting a discriminatory practice must pursue the remedy provided by the act." Channon, 629 N.W.2d at 858 (citing Northrup v. Farmland Indus., Inc., 372 N.W.2d 193 (Iowa 1985)); see also IOWA CODE § 216.16 (2011) ("person claiming to be aggrieved by an unfair or discriminatory practice must initially seek an administrative relief by filing a complaint with the commission in accordance with section 216.15.") The Iowa Supreme Court has noted that the civil rights statute "preempts an employee's claim that the discharge was in violation of public policy when the claim is premised on discriminatory acts." Borschel v. City of Perry, 512 N.W.2d 565, 567–68 (Iowa 1994) (citation omitted). As such, Plaintiff's public policy claims are pre-empted by ICRA.

Regardless of this Court's pre-emption determination, Plaintiff's violation of public policy claim fails as a matter of law. Iowa law recognizes a public policy against committing perjury and in favor of providing truthful testimony. Fitzgerald v. Salsbury Chemical, Inc., 613 N.W.2d 275, 286 (Iowa 2000) (noting that a party must only "show he had a good faith intent to truthfully testify"). However, in order to prove a violation of public policy Plaintiff must show, in part, that engaging in the protected activity caused the Defendant to fire the Plaintiff and that there was no overriding business justification for the termination. Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 761 (Iowa 2009) (citing Fitzgerald, 613 N.W.2d at 282 n. 2). Plaintiff has failed to raise a genuine issue of material fact with respect to key elements of the claim.

There is no dispute that Plaintiff told both Ms. Kain and Ms. Knutson that he intended to testify truthfully. That said, neither Ms. Kain nor Ms. Knutson made the decision to terminate the Plaintiff's employment, the decision was made by Ms. Holley. There is no evidence that Ms. Holley knew of the conversation regarding the Duric trial,

---

is preempted.

no evidence that Plaintiff's concerns regarding testifying were considered by Ms. Holley, and no evidence that the Plaintiff's engagement in protected activity caused Ms. Holley to terminate the Plaintiff's employment. Because the Plaintiff has failed to raise a genuine issue of material fact as to whether engaging in the protected activity caused the employer to terminate the Plaintiff's employment or that there was no overriding business justification for the termination of employment, summary judgment as to Count 5 is appropriate**.**

### III. CONCLUSION

As the Plaintiff has failed to raise a genuine issue of material fact as to any claim under Title VII, ICRA, or the public policy of Iowa, the Defendant's Motion for Summary Judgment, [Dkt. No. 16], is **GRANTED** as to all claims. The above entitled action is **DISMISSED**.

**IT IS SO ORDERED**, the Clerk shall enter judgment for the Defendant, Titan Tire Corporation.

**DATED** this 14th day of March, 2012.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA